SCANNELL, Ex parte. See Case No. 5,787.

------

## Case No. 12,437.

### SCARLETT v. VAN INWAGEN et al.

[9 Biss. 157; 8 Reporter, 673; 12 Chi. Leg. News, 49.] [1]

Circuit Court, N. D. Illinois. Oct., 1879.

PRINCIPAL AND AGENT—SPECIAL CONTRACT—NOT DISCLOSED—LIABILITY OF PRINCIPAL.

1. If an agent acting under a special contract with his principal, fails to disclose the special nature of such contract to those with whom he deals, the principal must suffer the consequence of such neglect on the agent's part.

2. C., a commission merchant or broker in Baltimore, arranged with defendants, who were brokers in Chicago, dealing on the Board of Trade, to send them orders for other parties, for the purchase or sale of grain for future delivery according to the rules of the board. It was also agreed that the defendants in keeping the account of such transactions should know

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 8 Reporter, 673, contains only a partial report.]

no one but C., but that each account should be in some manner designated so that it might be known who was the party ordering the purchase or sale through C. In this manner the business was carried on for sometime, the plaintiff being one of the parties ordering deals through C. In a suit by plaintiff for the recovery from defendants of the money paid by him to C., which was remitted to defendants, and for the profits realized by the defendants on these orders: *Held*, that the defendants by their agreement with C. to execute his orders, made him their agent to solicit and obtain such orders; that the presumption would be that the defendants acted for the person who gave C. those orders, especially when the name of such principal was disclosed; and that the defendants were liable to plaintiff, and could not hold any of the fund in their hands to reimburse themselves for any claim for balance against C.

3. The defendants were bound to know that they were acting for the plaintiff, and the nature and extent of their relation to him.

[This was a proceeding by Robert W. Scarlett against James Van Inwagen and others.]

Dent & Black, for plaintiff.
Wm. H. King, for defendants.

BLODGETT, District Judge. This is an action for money had and received by the defendants for the plaintiff's use. The facts as shown by the proofs on which the plaintiff claims to recover are, that in January, February and March, 1878, the defendants, Van Inwagen and Hamill, were engaged in business in this city as grain brokers and commission merchants. That much of their trade consisted in making contracts for their customers for the purchase or sale of grain and provisions for future delivery, pursuant to the rules, regulations and usages of the Chicago Board of Trade.

In the early part of January, 1878, one W. A. Cumming, who was a resident of Baltimore, Md., and about to commence business in that city as a commission dealer and broker in breadstuffs, made an agreement with defendants, by which they were to execute such orders as he might send them for the purchase or sale of grain in this market, and that the commissions for such trade should be divided between them, or, to state it more accurately, the defendants' commission for such services was understood to be one-fourth cent per bushel, and a rebate of one-eighth of a cent per bushel was to be made by the defendants to Mr. Cumming on all transactions which they made on his orders.

It was expressly agreed that the defendants were to know no one in these dealings but Cumming; that all the orders which he sent them and which they executed, were to be treated by them as his (Cumming's) own, and that defendants were to look to him, and him alone, for any and all sums that might become due to them in such business.

At the request of Cumming, the defendants agreed to keep the account of the different purchases or sales which they might make on his orders, by such terms—either names or numbers—as he might direct, so as to sepa-

rate or designate on the defendants' books, the different persons or interests for whom Cumming was dealing, or purported to be dealing.

In pursuance of this arrangement, Cumming returned to Baltimore, and opened an office, and held himself out to the public as a broker and commission dealer in bread-stuffs. Between January 31, and March 28, 1878, Cumming sent to the defendants for the plaintiff in this suit, divers orders for the purchase and sale of grain. These orders were sent by telegraph, and were all substantially in the following form—with changes as to amounts and dates: "Baltimore, February 15, 1878. Messrs. Van Inwagen & Hamill, Chicago.—At ·ten, sell 15 March Wheat, Scarlett. (Signed) W. A. C."

Some of the orders were to sell and others to buy grain, but all involved in this suit, except one, which was corrected in a day or two, contained the name of the plaintiff, Scarlett.

The defendants' answers or responses to such order by telegraph were substantially in the following terms: "Chicago, February 15, 1878. W. A. Cumming, Baltimore.—Sold 15 March, Scarlett, at 10. Van I. & H."

I give these copies simply as illustrations of the manner in which this business was transacted. The defendants entered these transactions on a separate page in their ledger, with the word Scarlett written in brackets, immediately following that of Cumming. The accounts of other transactions made by the defendants on orders sent by Cumming, seem to have been kept on the defendants' ledger, in the names of the persons mentioned in the body of the telegram, with the initials W. A. C. in brackets, with the exception of the account involved in this suit, which was kept in the name of W. A. Cumming, with the word Scarlett following Cumming. Whenever they closed out the transactions, they forwarded to Cumming a statement in substantially the following forms:

#### Account Purchase and Sale.
20,000 bushels wheat, by Van Inwagen & Hamill, Chicago, on account and risk, W. A. Cumming, (Scarlett.)

Account Purchase and Sale, 20,000 Bushels Corn. ·
By Van Inwagen & Hamill.
Account and risk, W. A. Cumming.
(Scarlett.)

| | | | | | | |
|---|---|---|---|---|---|---|
| Feb. 8, bought 20 M., 2 corn 42 | | | | | ........ | $8,400 |
| " 18, sold " " " " 42⅜ | | | | | ...... | 8,475 |
| | | | | | $ | 75 |
| Commissions | | | | ...................... | | 50 |
| Profit to your credit | | | ................. | | $ | 25 |

During the time in which these various orders were sent to the defendant by Cumming, for the plaintiff, and frequently in the same telegram containing plaintiff's order were other orders to purchase or sell grain for another name, such as "Kimball," "Kelley," etc.; and as I have said, these transactions were entered upon the defendants' ledger with the name of the party mentioned in the body of the telegram, with Cumming's initials following.

To secure themselves against loss on all these transactions, defendants were in the habit of drawing on Cumming for such sums as they from time to time thought necessary; without applying the proceeds of such drafts to any of Cumming's special orders, but intending to keep margin enough on hand to secure all his orders, treating them for that purpose as one account. The defendants' cash account with Cumming showing him debited with items for commissions, losses and insurance, and credited with proceeds of drafts, rebate, commissions and profits upon the various deals which were had where profits were realized.

About the 20th of March, 1878, the defendants closed out all transactions had by them on Cumming's orders, and the result, stated as one account, left Cumming in debt to the defendants in the sum of $789.29, which was settled by the defendants taking Cumming's notes for that amount, which, though now over-due are not paid. As drafts were made by defendants on Cumming for margins, he would call upon plaintiff for what he stated was his (plaintiff's) proportion of such draft, and the plaintiff paid to Cumming, on such requisition, the aggregate sum of $2,400, as follows: February 8th, $600; February 15th, $300; March 9th, $1,500.

And the profits realized by the orders given by the plaintiff amounted, in all, to $2,250, as shown by the statements rendered by the defendants to Cumming, as follows:

| | |
|---|---|
| Profits on 20,000 May corn, reported sold February 18 .................$ | 25 00 |
| Profits on 15,000 bushels, March wheat, reported sold Feb'y 16 ...... | 275 00 |
| Profits on 10,000 bushels, March wheat, reported sold Feb'y 25 ...... | 250 00 |
| Profits on 50,000 bushels, April wheat, reported sold March 8....... | 1,125 00 |
| Profits on 15,000, April wheat, reported sold March 29 ............ | 575 00 |
| | $2,250 00 |

The proof also shows that during the time these transactions were being had between Cumming and the plaintiff, Cumming stated to the plaintiff that Scarlett was a particular friend of his, connected with the firm of R. G. Dun & Co., a man of property and thoroughly responsible; and the proof shows that the plaintiff, at the time was a clerk in the firm, and another man named Scarlett, with different initials, was a partner in said firm; and it also appears that the plaintiff knew the form in which the orders were given to defendants, and saw the responses or answers to those orders soon after they were received by Cumming. He was also informed by Cumming of the receipt of statements of profits on these several orders, but he says in his testimony, which is not contradicted, that these statements were not

handed to him, and that he was not aware until some days after all these deals were closed that this statement showed that they were for the account and risk of Cumming only. There is no proof in the case showing that the plaintiff knew the terms of the special arrangement made between Cumming and the defendants, and the affirmative testimony of the plaintiff is that he knew nothing of this special arrangement by which the defendants were to know Cumming only, as the party to whom they were to account.

This suit is now brought by Scarlett to recover from the defendants the sums which he paid to Cumming and which Cumming testifies he remitted to defendants, and the profits realized by defendants on the orders given them by Cumming on the plaintiff's account; it being admitted that plaintiff, before the commencement of this suit, demanded payment of the defendants, stating the ground of his claim, and that defendants refused payment and denied any liability to plaintiff.

The plaintiff claims that Cumming was the agent of the defendants to obtain and transmit orders to them, and that the defendants, in executing these orders, knew, or had such notice as is equivalent to knowledge, that they were executing plaintiff's orders and that Cumming had no interest in them, save his share of the commission.

While it is contended on the part of the defendants that all their dealings were with Cumming; that by their agreement, they were to deal only with him, and were not to know or be responsible to his customers; the sole question in the case is: Does this special agreement with Cumming protect defendants from plaintiff's demand, under the facts in the case?

That the defendants acted in entire good faith, and with the belief that they were responsible only to Cumming, I have no doubt. But does such good faith protect them, if by their dealings they left or placed Cumming in a position where he might impose upon or defraud others? The arrangement, as made between the defendants and Cumming, contemplated that he was to obtain and transmit to them orders from other persons for the purchase and sale of grain. The proof shows the defendants knew Cumming was a man of no means, and not pecuniarily responsible; that he had no money on which to operate on his own account; that he expected to operate for others and made provision for keeping the account of his operations, for different persons, separate on the defendants' books; that as early as the 2d of February, the defendants were informed by letter from Cumming, that Scarlett was a citizen of Baltimore, pecuniarily responsible, and that he had operations in this place through other brokers, before giving the orders to defendants through Cumming. It must also be borne in mind, that the character in which Cumming placed himself was that of a general agent; his sign over the office door, "Commission Dealer in Breadstuffs," indicated that his business was that of a middleman, or negotiator between sellers and buyers; when he, in the due course of his business, proposed to transmit to the defendants plaintiff's order for the purchase or sale of grain, there was nothing done either by Cumming or defendants, to put the plaintiff on notice or inquiry that the defendants became only the agents of Cumming in executing plaintiff's orders. There is certainly, it seems to me, enough in proof to show that the defendants knew, from the inception of plaintiff's dealings with them through Cumming, that Cumming was not giving the orders on his own account.

Defendants, by their agreement to execute Cumming's orders, made him their agent to solicit and obtain such orders, and if Cumming failed to disclose the special nature of his contract with defendants to those with whom he dealt, then defendants should suffer the consequences of their or Cumming's neglect.

What Cumming did was to represent to plaintiff that he was authorized to solicit orders for the purchase or sale of grain in this market, to be executed by the defendants.

This made him the defendants' agent for that purpose, and the presumption would be that the defendants acted for the person who gave him these orders, especially when the name of the principal was disclosed, or sufficient information given to indicate who the principal was. The agreement between Cumming and the defendants must, I think, when all taken together, be construed as a contract on the part of Cumming to indemnify the defendants from any loss that should accrue on orders given through him. He agreed to stand between the defendants and loss, so that they need not look behind him to his customers for any deficiency that might occur in their dealings; but I cannot believe that the court should give the agreement the scope contended for by the learned counsel for the defendants, and hold that persons dealing with them through Cumming, without notice of this limitation on his authority, are bound by it.

It was urged with much earnestness on the trial, by the learned counsel for the defendants, that the defendants should not be made liable beyond the terms of their contract with Cumming, unless the proof shows them guilty of some bad faith to the plaintiff. Two answers to this occur to me: First—It may be said he (Cumming) should not be allowed to hold himself out as general agent for the transaction of this business, when, in fact, he was only a special agent, with limited powers. Secondly—Cumming being defendants' agent, they are bound by any contract he made in their behalf in the due course of the business which both Cumming and the defendants purported to be engaged in; that is, such busi-

ness as is usually done by brokers or commission men.

In Evans v. Waln, 71 Pa. St. 69, Waln employed one Markoe, a broker in Philadelphia, to sell certain railroad stock for him. Markoe placed the stock in the hands of one Wister, another broker in Philadelphia, who sent it to defendants, the firm of Evans, Wharton & Co., brokers in New York, to sell. The defendants sold the stock, but insisted upon deducting from the proceeds a balance due them on general account from Wister, who had failed. On the trial of the case, defendants offered to prove that it was the custom of stockbrokers, when dealing with stockbrokers in other cities, to put all transactions between them into one account, and remit or draw for the general balance. This offer of proof being rejected, on error assigned the court said: "Nor was there any error in rejecting the offer to show that it is the custom of stockbrokers, when dealing with stockbrokers in other cities, to put all the transactions between them into one account, and to remit or draw for the general balance. Such a custom, if proved, would have constituted no defense to the plaintiff's action. Admitting its existence, the defendants had no right to credit Wister's account with the proceeds of the stock. He was not the owner of it, and he had no title or claim to its proceeds. * * * Besides. it does not appear that they did credit him with the proceeds, and no offer was made to show that any such credit was given. It is clear, then, that whether the custom was known to the plaintiff or not, this case is not within its operation. And if so, evidence of its existence would not help the defendants, and was, therefore, rightly rejected. But if the defendants had received the stock from Wister—knowing as they did that it belonged to the plaintiff—they would have had no right to apply the proceeds arising from its sale to the payment of Wister's indebtedness. If there is a custom among stockbrokers, when dealing with others, to appropriate money belonging to the principal to the payment of his broker's indebtedness, the sooner it is abolished the better: 'Malus usus est abolendus.' A custom so iniquitous can never obtain the force or sanction of law, and the marvel is that it should be set up as a defense to this action."

The only distinction between this case and the one now under consideration is, here the defendants set up a special agreement between themselves and Cumming, by which they claim to put all transactions between them "into one account and remit or draw for the general balance." The same principle is sustained by many authorities, among which are: Semenza v. Brinsley. 114 E. C. L. 467; Cheap v. Cramond, 6 E. C. L. 645; Dunlap, Paley, Ag. 330–334.

The case is, in many respects, analogous to that of a member of a copartnership. who specially stipulates that he shall not be liable for the debts of the firm. And yet the courts hold uniformly that such an agreement does not protect the partner from liability to creditors who trust the firm without notice of such special agreement.

In such case, the partner is made liable beyond his contract, on the ground that he cannot be allowed to set up a special contract of this kind against an innocent creditor. Indeed, I incline to the opinion that the liability of defendants in this case could be sustained in the light of most respectable authority on the ground of a partnership between defendants and Cumming. The agreement to participate in commissions making them liable, as partners, as to all business sent them by Cumming.

The evidence shows that the money paid by plaintiff to Cumming, and by him forwarded to defendants, was applied to the credit of Cumming's general account, and that defendants had no notice of the amount so paid by plaintiff. It would seem at first to be a harsh rule to compel defendants to repay to plaintiff money which they never knew they received from him, but the answer is that it was their duty to know whose money Cumming remitted to them. If, as I have said, they are bound to know they were acting for plaintiff, then they were bound to know the nature and extent of their relation to him.